All right, Mr. Snook, whenever you're ready. Welcome back. Thank you. Does this belong to prior counsel? You want to hand it to him? I'll take it. Thank you. May it please the court. In this case, Judge Conrad, I know you're familiar with it, having seen it once before, Judge Conrad ruled before trial that the government did not have to prove that Steve McFadden knew that the substance he was distributing were controlled substance analogs. This was obviously deemed by eventually the Supreme Court to be error. And what I wanted to point out was just a couple of things about the way in which the error pervaded the trial. There were two major differences that if we had not been told in advance that we were going to be limited by the evidence, we would have had Mr. McFadden testify about his state of mind, which clearly wasn't relevant under Clecker or under the instructions ultimately given. And also, it is possible that we would have had an argument that we could have made that he might have been guilty as to some of the later transactions, but not as to some of the earlier transactions. For example, his state of knowledge might have developed over time, and he might not have been aware early on, but would have been aware later on. And certainly, some of the evidence that the government has cited about his state of knowledge would come, for example, in some e-mails in November of 2012 after all of the actual substantive transactions that were the subject of these prosecutions. At what stage in the proceedings did Judge Conrad convey to you what his view of the law was? We had filed a motion asking for guidance as to what the court's ruling was going to be, a pre-trial motion. Pre-trial. Pre-trial. He gave a ruling on January 4th, right before trial, that said, in fact, the specific comment that he made on our motion, the defense requests for an instruction that would require the jury to find beyond reasonable doubt that the defendant knew that the substances he was distributing were controlled substance analogs is denied. The parties are advised that the court intends to utilize the elements set forth by the Fourth Circuit in U.S. v. Plecker and its instructions to the jury. That's at page 105 of this court's original appendix. So, and then the trial started, I believe it was on the 7th, which is I think the Monday following that. We had a charge conference with the court. I think it was either on the 8th or the 9th. It was the second or third day of trial before, frankly, before everything had wrapped up. And certainly Judge Conrad's style in a lot of these things is to meet collegially with counsel back in chambers and kind of hash things out sort of as we go along rather than you have the days of trial and testimony and then all of a sudden the one time when you actually talk about things. Is this argument in your brief? I didn't remember. I didn't make a trial tactic. I didn't actually discuss that particular issue, Judge. Frankly, the argument that we made now four, five, six months ago in response to this court's invitation was specifically, frankly, based on law and why it is. But I think the important point that I want to make for the court is that when you look at the authority cited by the government, and, for example, you look at the United States versus Nieder, Nieder is a case where there was no issue that somehow facts would not have been presented. I mean, all of the cases that Nieder refers to, Rose versus Clark, for example, talking about a mandatory presumption, that is entirely an issue of argument to counsel or the legal standard to be applied. It doesn't affect, there is no allegation in those cases that it would affect the actual trial of the case, the evidence being presented. But, Mr. Snookit, it seems to me that your argument, and I'm very sympathetic to any argument that a defendant would have tried a case differently, you know, had the law been correctly articulated. But it seems to me that you've got a little bit of a problem in your chronology of events, and this is what I'd like you to address. Okay. I think you have a very strong, just as Thomas breaks down into two different categories, knowledge of the identity and knowledge of the chemicals, the effect of a chemical substance. It seems to me, at least at this point, you've got a pretty good argument as to counts two, three, and four that McFadden didn't know, at least under the harmless beyond a reasonable doubt standard, that he didn't know either the identity and he didn't know the chemical composition. But after August 25th, when he starts talking with McDaniel in those recorded phone conversations, and he starts comparing the bath salts to methamphetamine and cocaine, and then talks about, well, this does a little bit more than hardball, you know, it's a half a hardball or whatever, and he talks about aromatherapy and burning and something's more hardcore than another, and I won't go on and on, but he seems to show a level of familiarity with the chemicals and what the chemicals do vis-à-vis other scheduled substances. So why isn't August 25th, 2011, forward kind of a breaking point in the case? How does he get beyond Justice Thomas' category two of cases, familiarity with the chemicals, once we start looking at those phone conversations in the count five on down? Well, probably the best answer I can give to that is to say that Mr. McFadden, not having ever actually used either any of the substances he was selling or the substances he was comparing to, I think he testified at the sentencing, that basically that's what he was saying to make a sale. Now, that's a credibility issue. It's a credibility issue for a jury to make. If he wants to get on the witness stand, we would have him get on the witness stand at a trial and say, I was there as a salesman, I may be a jerk, but I really wasn't trying to violate the Controlled Substance Analog Act or any other federal drug act, and I didn't know the things that the U.S. Supreme Court has said that I have to know. Now, again, credibility question. He took a stand at the trial, didn't he? At sentencing. No, he didn't. Just at sentencing. Yes. And that was one of the reasons, again, Judge Conrad had said that we could simply proffer his testimony at sentencing, given that he was ruling against us on Klecker, and I preserved that point during the trial. The court specifically said I could present him at sentencing for that purpose. It would be considered for that purpose, and we did so. Well, Denise, under your theory then, there could never be harmless beyond a reasonable doubt in a case of this nature because the defendant could have been lying to the salesperson, to the purchaser, to the drug purchaser. If he was lying to McDaniel, then maybe he wasn't familiar with the chemical composition. So, I mean, isn't that the necessary end point of your argument, that you could never have harmless beyond a reasonable doubt factually because the defendant could have been lying when he was trying to make the sale? The issue, I suppose, also has to – the answer to that needs to embrace also the – what's sometimes called the Turcotte inference. And the inference is that if you know that it has a particular pharmacological effect, that you are – it is inferred as permissible inference that you know something about its chemical structure. And that is simply, in this case, not a valid inference. There is a recent decision by the Tenth Circuit, U.S. v. McCarr, M-A-K-K-A-R, that was decided after our briefs went in. It's 8-10-F-3-11-39, that basically makes that point. That's a case where the court said the Turcotte inference would not have been appropriate. And it's a case where ultimately the case was reversed, even finding that there was plain error in that case. We've been spending a lot of time discussing legal doctrine here, but I'm not sure that you've really come to terms with the significant amount of evidence that was introduced against your client. He's running the business under the rubric of a bath salt business. But are bath salts sold in plastic bags? And are bath salts weighed according to the ounce? I mean, when I saw the prices in these sales, they vary from $30 to $70 per gram, and then he sold them for $15 per gram and approximately $425 per ounce. When I see something like that, I'm not aware that bath salts are necessarily sold in that kind of measured way, nor have I... I don't use bath salts, but I would be surprised if bath salts sold for $425 per ounce. That would be a very expensive bath salt. And so I'm wondering if he's going to choose to market these things under bath salts. He's stuck with the label that he applies, and I don't know of a lot of bath salts that are named hardball. Most people don't want a bath salt that's hardball. They like something soft in a bath salt. And you have speed, no speed, the new up. That doesn't exactly fit within bath salt marketing. If you talk to a marketing representative for a bath salt company, they wouldn't label it hardball. He's also talking with McDaniel and everything about the pharmacological effects and comparing it to heroin or cocaine and meth and the rest, and I can't imagine somebody selling bath salts and talking about, as he also did, whether they're snorted or smoked. Do you smoke bath salts? Do you snort bath salts? I mean, we can talk about the fine points, if you have, of harmless heroin. That's fine, because I respect the thing of the Supreme Court's remand, but there's a mountain of evidence here. I mean, if you can smoke a bath salt, I'd be happy to hear about it. Well, let me say, first of all, and I know I'm about to run out of time. I was about to run out of time. I should have moved on before you asked the question, but let me answer it. The first point I would make, Your Honor, is that the argument that we – the first argument, the first response I would make, is the court has identified what might be a great misbranding case. A great what? Misbranding. In fact, many of these cases are actually brought with account for misbranding, and I don't remember exactly what the citation is, but there are plenty of cases out there where bath salts or controlled substance analogs are being pursued, both under the Controlled Substance Analog Act and under misbranding, and that's exactly what has been the problem in many of these other cases. I see that I'm out of time. May I simply respond to the balance? Yes, sir. Thank you. The second point that I wanted to make, Your Honor, is that when this case was argued to the U.S. Supreme Court, the specific point was made that Steve McFadden thought he had done the time-honored American practice of fighting a loophole, and that's exactly what he thought he had done. The third point related to that is, and I'm going to take the rare step of quoting Justice Scalia from the argument, where he basically said, you know, you charge what the market will bear, and if it has the same effect as cocaine and it's perfectly legal, why not charge the price of cocaine? In fact, it may be worth more because it's legal. Mr. Snookin, I apologize for stepping in here, but is a bath salt, according to your position, something you sprinkle in a bathtub when you're taking a bath? What Mr. McFadden was telling folks. Does the record show what a bath salt is? It does. Because I don't have a clue what a bath salt is except for maybe you put it in when you take a bath. What Mr. McFadden was telling folks that it was for was aromatherapy. You put it on a burner. We introduced the burner, the kind of burner that's sold in stores all over the place, and you put it on the burner and you light the flame underneath it and it creates an aroma. That's the way it was being marketed. The name popularly given is bath salts, and in fact there are some places that have sold things as bath salts. Mr. McFadden was selling it as aromatherapy. Thank you. Thank you. Anthony, if I try to say your last name, I'll mess it up. I don't want to offend you, so you can tell us. When I was in Patrick County, people used to call me Geronimo, and I answered to that as well. I took that as well. Please, the Court, good morning. My name is Tony Giorno. I'm an assistant United States attorney here on behalf of the United States. This Court has been requested by the Supreme Court to consider this case in light of the harmless error. The harmless error standard as set forth in the Nieder case, which the Court is well familiar with, essentially says that this Court conducts a thorough examination of the record to determine whether or not a rational jury, if properly instructed, beyond reasonable doubt would have come back to the same decision as the jury did in this case. I would submit to the Court that upon conducting that thorough examination of the record, the Court should find that the error in this case is, in fact, harmless. Do you draw a distinction? The same question I asked Mr. Snook. Do you draw a distinction between counts 2, 3, and 4 before the conversations between McDaniel and McFadden, or are you saying they're all equally strong? Your Honor, with regard to the harmless error analysis, I think they're equally strong, but certainly much stronger after the date that you identified, the August 25th date. So you're saying that his statements after the fact can be imputed to his knowledge before the fact? Yes, Your Honor. What struck me about this case, Your Honor, was that from the outset, Mr. McFadden conducted himself like the typical drug dealer that this Court has seen many, many times. And we've cited that evidence in our brief, and Wilkinson alluded to it in his question of Mr. Snook. And these are the things, like the use of the name. Everything he did was exhibit a knowledge of controlled substances. He used names like controlled substances. He marketed these products to Lois McDaniel with words like alpha, speed, no speed, up and new up, hardball. Excuse me, though. He's got to come, using Justice Thomas' analysis, he's got to come under situation 1 or situation 2. What are you contending? I think that on the evidence looking at a whole, it falls under both for the reasons that we've argued. Okay, what's the evidence of instance 1 that he knew the identity of the substance? He said that he didn't have to know the identity of the specific substance. He had to know under element number 1. He had to know that the substance was controlled under the CSA or Analog Act, even if he didn't know the identity. Excuse me, I misspoke. So he had to know it was controlled. Where's the evidence under number 1 that he had to know it was controlled? It seems to me the only way you get to where you want to go possibly is number 2. He was aware of the specific features of the substance that make it a controlled substance analog. How do you get where you want to go under number 1, that he knew that the substance was controlled under the CSA or Analog Act, even if he did not know its identity? Because I think, Your Honor, that if we take what Justice Thomas said in his footnote, that that knowledge can be shown not only by direct evidence but by circumstantial evidence as well. I think that the evidence that is concerned... But you're talking harmless beyond a reasonable doubt. That's a huge hurdle. It is, Your Honor, but... You're just relying on circumstantial evidence to prove harmless beyond a reasonable doubt. No, no, Judge King. We are also relying on direct evidence.  No, I'm saying 2, 3, and 4. I'm sorry, Your Honor. Yeah. No, I agree with that. I agree with that. With regard, and I didn't mean to conflate the different counts, but I'm looking at the record as a whole and going forward. I think that the strongest evidence, unquestionably, the strongest evidence in this case comes directly from Mr. McFadden's mouth after the date that you've identified as being the cutoff. Mr. McFadden, in answer to the Court's question, I think the question was asked, Judge Keenan may have asked the question directly. What are bath salts? How do you use them? What do you do with them? Well, bath salt, to me, is something you put in your bathtub. If we accept Mr. McFadden's presentation that, well, it's supposed to be aromatherapy, and this was just salesmanship, that makes no sense to a rational mind at all. I mean, if I'm trying to sell you aromatherapy, and saying this particular product is something that you use for aromatherapy, first of all, it's $15 a gram, and second of all, how is it salesmanship to say, this is aromatherapy, and you know what, if you use it and you put it in your bath, it will be just like cocaine, methamphetamine. What would the rational person think about that? If I took a bath and I want aromatherapy, do I really want to get stoned on cocaine or methamphetamine? And the answer is no. And the other thing I think that's important in this case, concerning the knowledge element, and again, I apologize, Judge Keene, if I'm sidestepping your question. I don't mean to. No, I think you answered. But in this case, it's not the kind of case where what Mr. McFadden was doing was taking a packaged product. He gets a package, and he sends it directly to Ms. McDaniel. The evidence in this case, uncontradicted, is that he's making this stuff. He's making it in his house. He's buying the chemicals, and he's making the stuff, and he's sending it out. And when he's making these representations to Ms. McDaniel, he is saying this stuff is just like crystal meth, it's just like cocaine, and I'm combining the alpha and the 4-MEC, and that's just like the MDPV. And it seemed only logical, despite the fact that he's just a construction worker. He had to have some knowledge gleaned from some source to be able to put this together, because not only was he making it and representing it as a controlled substance, but it was, in fact, we know for a fact. When you stress, to follow up on a good point that Judge Keenan made, when you stress the pharmacological nature of this and the fact that it's like cocaine or like whatever, that is pretty strong evidence that you've come on to Section 2 of the Supreme Court's McFadden opinion, because that asks, are you aware of the nature of what you're selling? And when you stress the pharmacological effect and the similarities, and you're the one that's put it all together and baked it up, a reasonable jury would conclude that how could you not be aware? This is not even a case of willful blindness. This is not, as you point out, somebody who's misbranding something or accepting a prepackaged product. It's somebody who's, I guess, in his own lab making these confections up and then selling them on their pharmacological effect. When I started thinking about pharmacological effect, that seemed to me to fit within that second prong of what the Supreme Court was talking about in its opinion. I agree with that, Judge Wilkinson. And in this particular case, there was no question that Mr. McFadden, when he sold the stuff, intended it for human consumption. The jury found that beyond a reasonable doubt. So if you add that and his representation of what the effect would be, the pharmacological effect would be, I think that certainly the government's strongest evidence would fall under the second prong of McFadden. Let me ask you a question. I know this wasn't in the brief, but defense argues that based on the pretrial ruling Judge Conrad gave us, we structured our defense a particular way, which included not putting the defendant on stand. I know, as a trial lawyer, that's easy to say now. It's easy to say I'm going to put him up next time because he's now bound by that. But it was a pretrial ruling. It did go to a critical issue that we now know was wrong, that it would be logical for that information to affect your defense. So respond to his argument that because it caused a change in trial strategy, I should get another trial. I think at the outset, I think your observation, I think Judge Keenan's observation as well, it's easy to come in after the fact and say, and I think the words he used were, it's possible I could have introduced evidence of that. I might have put Mr. McFadden on, but we all know from having done trials, there are any number of reasons why you might or might not do a particular thing. I can think of a very strong reason not to put Mr. McFadden on the stand because he'd be subject to cross-examination by my colleagues who actually did the trial. And in that cross-examination at the sentencing, not at the trial, but the sentencing, he admitted a lot of things. He admitted making the stuff. He admitted making these representations about cocaine. It was just salesmanship. I think that… You're saying in response to my good colleague's question that the reason that he wasn't put on the stand was that he didn't want the case to turn on McFadden's credibility. I think that's certainly a factor, Judge. I don't know what Mr. Snooks is a very good lawyer. But you're saying it's quite possible that in any second trial, he might not want the case to turn on Mr. McFadden's credibility? In looking at Mr. McFadden's testimony at the sentencing hearing, Your Honor, I don't see where Mr. McFadden materially advanced his cause in the case. I mean, because the statements he was making, it really was a mountain of evidence, irrefutable evidence. I guess no rational jury would have accepted that. For example, his statement that when I told him, when I told Ms. McDaniel this was like cocaine and methamphetamine, that was mere salesmanship, oh, gee, lo and behold, it actually had that effect. You can see all this evidence that came in directly in the government's case in chief or through Ms. McDaniel coming in as impeachment evidence in addition if Mr. McFadden takes a stand. So what you're doing is you're causing the jury to listen to all that stuff twice. And secondly, in the context of McFadden's credibility, that's a tough road. Yes, Your Honor, that is. The evidence in this case is, from the government standpoint, was compelling and measured against what a rational jury, if properly instructed, would have done. We would submit to the court that on this record, as the court has defined to you, that the failure to include that one element is harmless beyond a reasonable doubt, and we would ask the court to do so. Thank you. Mr. Nook, reply. Thank you for letting me have a few comments. There are a couple of points I wanted to make. One was, as I look through the record for the response to Judge Wilkinson's question, I don't see any indication that Mr. McFadden ever used the phrase bath salts. He did refer once to salts on page 735 of the appendix in one of the conversations, but he was always fairly clear in talking about burning or aromatherapy or something along those lines, not bath salts. The government talked about bath salts. The government agents referred to it as they would give their preamble to a phone conversation. That happened on page 748. That happened on page 751 of the record. But that was not Mr. McFadden's language. The court was asking about whether the case, if it were retried, would it turn on, would we want the case to turn on Mr. McFadden's credibility? Maybe we didn't put him up on the witness stand because we didn't want the case to turn on his credibility. I can tell the court we didn't want it to turn on his credibility when he had nothing to offer on the issue that was, in fact, before the court. It would be malpractice to put him up for no gain. But if the jury were properly instructed, there might have been a gain to it. And that's the point that I wanted to make in that respect. Why can't we look at his testimony at the sentencing hearing and use that to evaluate what his testimony would have been on the trial of the merits? Certainly that is a guide, Your Honor. And I'll be honest with you, I didn't know where ultimately the U.S. Supreme Court was going to be taking us. Neither did we. And so to a certain extent, we were putting him up there in part as a proffer, in part to convince Judge Conrad that he's a nice guy and that he wasn't trying to break the law. In fact, he was trying to not break the law. And obviously the jury had already found in a way that made that only a sentencing issue and not a guilt issue. I personally had the sense that he came across reasonably well at sentencing. You may read a cold transcript and get a different opinion. Obviously a jury would have to make that determination at some point, which gets back to my argument that this is essentially the question, if it's a credibility question, it's a jury question. It's not a question for this court. It's a question for the jury. No, but the Supreme Court remanded this on harmless error. And, you know, there are a lot of harmless error questions under the neater standard and the reasonable doubt standard, which I think we all agree applies here. It seems to be somewhat close, but honestly there's just a mountain of evidence here. And the conversation with Ms. McDaniel at the end is very hard to get around. And that's not circumstantial evidence. That's direct. He's talking there. And one of the things you can't do in harmless error analysis is to try to divide and conquer and say, well, we can explain this piece of evidence. You have to explain it in its totality. And when you actually discuss with a particular client, customer, the pharmacological effects of what you're selling and you compare them to cocaine and meth and you give them names that suggest drug effects. You sell them in plastic baggies and you sell them at prices for grams and ounces. It's also just, and you talk about snorting and smoking, that's also emblematic of illicit trade in drugs or at least an awareness of the nature, the exact nature of what he was selling. It's hard to me to see how a reasonable jury could conclude that he was blissfully ignorant or unaware of exactly what he was selling and the effect that it was going to have. And if it was just one piece of evidence, okay. But at a certain point in time, evidence becomes cumulative. Your Honor, I get back to quoting my good buddy, Justice Scalia, for the proposition that you are allowed to go sell something that will get you high. Getting you high is not a crime. I understand that there was an instructional error, but this is not just getting you high. It is discussing and comparing what is being sold here to substances that a second grader would recognize as illicit. It's not just some generalized high. Well, Your Honor, I would say, first of all, we get back to the point that it is not a crime to sell an intoxicant. It is only a crime to sell an intoxicant under certain circumstances. But he's not selling it. But, I mean, how do you, it's also true that drugs produce a high, at least initially. And it's the specific comparison with McDaniel to known illicit substances that's so damaging. You would give anything, driving down here, driving back, not to have that conversation in evidence. Well, certainly I would rather it weren't in evidence. But I also would submit to the Court that that's a proper role for a jury. And that the jury might well conclude that Mr. McFadden's denial of that intent, and that his statement that he didn't know the chemical involved, and he was just sort of puffing to make a sale. The Court will note that in virtually every instance, it was always she was asking him, is it like this drug? Is it like that drug? And you can even see there going, it's like that one. Anyway, I've used up my time. Thank you, Mr. Lewis. We'll come down to Greek Council and then take a break for about five or ten minutes. The Honorable Court will take a brief recess.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Barbara Milano Keenan